# NO. 12-20-00082-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *SEAN SELF,*<br>*APPELLANT* | § | *APPEAL FROM THE 392ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *WEST CEDAR CREEK MUNICIPAL*<br>*UTILITY DISTRICT,*<br>*APPELLEE* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Sean Self appeals from the trial court's take nothing judgment rendered in accordance with its order granting the plea to the jurisdiction filed by West Cedar Creek Municipal Utility District and dismissing Self's suit for damages caused when his home was flooded with sewage. Self raises three issues asserting the trial court erred in refusing to admit proffered video evidence and in determining the District did not waive immunity. We affirm.

## BACKGROUND

Self and his wife Kimberly entered into a contract with the District in 2012 for provision of water and sewer services. After sewage backed up into their home in April 2015, the District made some repairs to the vault system used by the District to provide sewer service. In September 2016, a considerable amount of sewage backed up into the Selfs' home. They filed suit against the District alleging negligent use of motor-driven equipment, premises defect, unconstitutional taking, non-negligent nuisance, and breach of contract.

The District filed a plea to the jurisdiction asserting that the District's governmental immunity, provided by the Texas Tort Claims Act (TTCA), bars the Selfs' claims. After a hearing, the trial court granted the plea to the jurisdiction, dismissed the Selfs' claims against the

District, and rendered a final judgment that the Selfs take nothing. Sean Self filed a notice of appeal.

## ADMISSIBILITY OF EVIDENCE

In his second issue, Self asserts the trial court erred in determining that his proffered video evidence is inadmissible hearsay. Self contends the video is admissible as an exception to the hearsay rule under Texas Rule of Evidence 801(e)(2)(D), and the error caused irreparable harm.

On the night of the sewage back up, Self recorded District employees who made statements as to the cause of the flooding. When counsel offered the exhibit at the hearing, the District objected, asserting that the video constituted hearsay. Counsel asserted that the exhibit "is not hearsay because it was made in the due course of the events of the evening." Self's counsel explained: "The video is to show, Your Honor, the individuals in the course of their work performing the repair on the sewage pump system, explaining what went wrong with the sewage pump system and why it went wrong." Counsel did not respond when the trial court asked him to identify an applicable exception to the hearsay rule. Counsel did not make an offer of proof or file a bill of exception. On appeal, Self said he "was never given an opportunity to exhibit the video evidence." The video is not part of the appellate record.

A party seeking to introduce evidence as an exception to hearsay has the burden of clearly showing that the evidence falls within the exception. *Roberts v. Allison*, 836 S.W.2d 185, 191 (Tex. App.—Tyler 1992, writ denied). Rule 801(e)(2)(D) provides that a statement offered against a party that was made by the party's agent or employee on a matter within the scope of that relationship, and while it existed, is not hearsay. TEX. R. EVID. 801(e)(2)(D).

Self did not raise any exceptions to the hearsay rule at trial, and therefore waived reliance on Rule 801(e)(2)(D). *See Ortega v. LPP Mortg., Ltd.*, 160 S.W.3d 596, 600 (Tex. App.—Corpus Christi 2005, pet. denied); *State v. Foltin*, 930 S.W.2d 270, 273 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (op. on reh'g). Furthermore, although Self testified that the individuals in the video are District employees, there is no evidence as to the scope of their employment or whether their statements regarding use of plastic couplers is within that scope.

Moreover, to preserve error concerning the exclusion of evidence, the complaining party must actually offer the evidence and secure an adverse ruling from the court. ***Bobbora v. Unitrin Ins. Servs.***, 255 S.W.3d 331, 334 (Tex. App.—Dallas 2008, no pet.). While the reviewing court may be able to discern from the record the nature of the evidence and the propriety of the trial court's ruling, without an offer of proof, we can never determine whether exclusion of the evidence was harmful. *Id*. at 335. Thus, when evidence is excluded by the trial court, the proponent of the evidence must preserve the evidence in the record in order to complain of the exclusion on appeal. *See* TEX. R. EVID. 103(a); ***Bobbora***, 255 S.W.3d at 335. When no offer of proof is made before the trial court, the party must introduce the excluded testimony into the record by a formal bill of exceptions to preserve the evidence for the appellate record. *See* TEX. R. APP. P. 33.2; ***Bobbora***, 255 S.W.3d at 335. Failure to demonstrate the substance of the excluded evidence results in waiver. *See* TEX. R. APP. P. 33.1(a)(1)(B); ***Bobbora***, 255 S.W.3d at 335. Because Self did not make an offer of proof or file a bill of exceptions to preserve the evidence for the appellate record, he has waived his complaint that the trial court erred in refusing to admit the video. We overrule Self's second issue.

## PLEA TO THE JURISDICTION

In his first and third issues, Self contends the trial court erred in granting the District's plea to the jurisdiction.

### Standard of Review

Governmental immunity from suit defeats the trial court's subject matter jurisdiction and is properly raised in a plea to the jurisdiction. ***Tex. Dep't of Parks & Wildlife v. Miranda***, 133 S.W.3d 217, 225-26 (Tex. 2004). Where a government entity challenges the court's subject matter jurisdiction on the basis of immunity, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity. ***Ryder Integrated Logistics, Inc. v. Fayette Cty.***, 453 S.W.3d 922, 927 (Tex. 2015) (per curiam).

We review a trial court's ruling on a plea to the jurisdiction using a de novo standard of review. *See* ***State v. Holland***, 221 S.W.3d 639, 642 (Tex. 2007); ***Miranda***, 133 S.W.3d at 226. In determining whether a plaintiff's claims are barred by immunity, we look to the substance of the claims alleged because governmental immunity cannot be circumvented by artful pleading. *See* ***Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie***, 578 S.W.3d 506, 513 (Tex. 2019).

We look to the true nature of the dispute rather than the plaintiff's characterization of the claims. *Id*. We construe the plaintiff's pleadings liberally, taking all factual assertions as true, and look to the plaintiff's intent. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012).

We consider evidence when necessary to resolve the jurisdictional issues raised. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). When evidence is presented with a plea to the jurisdiction, the court reviews the relevant evidence and may rule on the plea as a matter of law if the evidence does not raise a fact issue on the jurisdictional question, a standard that generally mirrors the summary judgment standard. *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 798 (Tex. 2016). If the evidence raises a fact issue regarding jurisdiction, the plea cannot be granted, and a fact finder must resolve the issue. *Miranda*, 133 S.W.3d at 227-28.

All the evidence is reviewed in the light most favorable to the plaintiff to determine whether a genuine issue of material fact exists. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). The plaintiff has the burden to present sufficient evidence to create a genuine issue of material fact regarding the jurisdictional issue. *Id*. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Suarez v. City of Texas City*, 465 S.W.3d 623, 634 (Tex. 2015). Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

**Negligence—Texas Tort Claims Act**

In his first issue, Self contends the trial court erred in granting the District's plea to the jurisdiction with regard to his first cause of action, negligent use of motor driven equipment. He alleged that the District utilized a plastic coupler which broke and caused the sewage backup. He argues that the part that failed, the coupler, is "part and parcel" of the motor driven pump. Alternatively, he asserts that evidence was presented that the motor driven pump was itself responsible for the failure of the plastic coupler. Thus, Self asserts his claims invoked the waiver of immunity found in the TTCA for property damage arising from the District's negligent operation or use of motor-driven equipment.

4

*Applicable Law*

The TTCA provides a limited waiver of governmental immunity. ***Alexander v. Walker***, 435 S.W.3d 789, 790 (Tex. 2014) (per curiam). In relevant part, the statute provides that a governmental unit in the state is liable for

> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of employment if:
>     (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
>     (B) the employee would be personally liable to the claimant according to Texas law . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2019).

The term "motor-driven equipment" refers to articles or implements driven by a motor and used for a specific purpose or activity. *See* ***Tex. Nat. Res. Conservation Comm'n v. White***, 46 S.W.3d 864, 868 (Tex. 2001). This term includes motor-driven pumps. *See id*. The term "operation," as it is used in the TTCA, refers to "a doing or performing of a practical work." ***LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.***, 835 S.W.2d 49, 51 (Tex. 1992). "Use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Id*.

The statute does not define "arises from." This standard requires a "nexus between the operation or use of the motor-driven . . . equipment and a plaintiff's injuries." ***Ryder Integrated Logistics, Inc.***, 453 S.W.3d at 928. Such a nexus requires more than mere involvement of equipment but rather "the equipment's use must have actually caused the injury." ***Dallas Area Rapid Transit v. Whitley***, 104 S.W.3d 540, 543 (Tex. 2003). The operation or use of motor-driven equipment "does not cause injury if it does no more than furnish the condition that makes the injury possible." ***Dallas Cty. Mental Health & Mental Retardation v. Bossley***, 968 S.W.2d 339, 343 (Tex. 1998). The Texas Supreme Court described this threshold as something more than actual cause but less than proximate cause. ***Ryder Integrated Logistics, Inc.***, 453 S.W.3d at 928-29. A plaintiff can satisfy the "arising from" standard by demonstrating proximate cause. *Id*. at 929. The components of proximate cause are cause-in-fact and foreseeability. *Id*. at 928-29. Cause in fact is essentially but-for causation. *Id*. at 929. "Given the Legislature's

preference for a limited immunity waiver, we strictly construe section 101.021's [motor-driven equipment use] requirement." *Id*. at 927.

*Analysis*

In his petition, Self alleged:

> Defendant operates a sanitary sewer and sewer service. The system contains vaults and lift stations which consist of stationary motor-driven pumps and related components including, but not limited to, switches, floats, piping, and valves. Failure of the vault system provided by Defendant to mitigate and control the pressurized sewage led to back up of raw sewage into the Plaintiff's home.
> . . . .
> An employee of the governmental unit, breached his duty of ordinary care through the negligent maintenance and repair of the motor-driven vault system during previously performed repairs while acting in the regular scope of his employment.
> . . . .
> The damages to Plaintiff's property and person were due to the ordinary operation and use of the motor-driven vault system and were the proximate cause of the damages to Plaintiff's property and person. The motor-driven vault system is operated and under the exclusive control of the Defendant. But for the negligent repair and maintenance of the vault system, the Plaintiff would not have suffered damage to property and/or person. Defendant's negligent maintenance and repair were foreseeable to cause property damage and personal injury.

The parties agree that a plastic coupler, also known as a quick connect, failed. Self argues that the pump, valves, and coupler are all one system, the components all function together as a unit, and the system is unable to function if any of the components are inoperative. Thus, Self contends the coupler is part of the motor-driven pump and indistinguishable from the pump itself for purposes of liability. The District contends the flooding was caused by the failure of the coupler, and not the pump.

Anthony Ciardo, the District's general manager, testified as the District's expert. The District provides water and wastewater service within its certified area. The sewer consists of a gravity system, a vacuum system, and a pressure system, with most being a pressure system.

Ciardo described the residential collection system that was in Self's tank. Sewage leaving a customer's house goes into a holding tank which is two feet in diameter. The line from the house is stuck through a hole in the tank and freefalls into the tank. In the holding tank, there is a pump. The line from the house is not attached to the pump. A vertical inch and a quarter discharge pipe comes off the lower portion of the pump and, after a ninety-degree bend at the top

6

of the pipe, there is a check valve, then a coupler, then a gate valve on the discharge line "leaving the sewer can." The check valve is to prevent sewage from backing up through the pump. The gate valve is used to close off the discharge leaving the pump. The valves and coupler are inside the tank.

Self's system contained a two-horsepower grinder pump. Ciardo described the pump as an electrical, motor-driven pump that has cutting blades in it like a grinder. He further explained that there are three float switches. As the level rises in the tank, the pump will start up when the water reaches float number two. It will suck the sewage through the pump and chew it up. Once the sewage is chewed up, "[i]t comes up through the bottom. It rises up through the discharge, goes through the check valve, through the coupler, through the gate valve, and then out to the distribution system." When the fluid level drops in the tank, the pump will shut off.

Kenneth Wright, maintenance manager at the District, also described the system: "You have a tank on the outside, a grinder pump, discharge, check valve, check valve [sic] – the pump, of course, pumps it out. Check valve keeps the pressure from coming back. And its's a quick coupler for removing the pump. And isolation valve going out." The gate valve is the isolation valve. The check valve keeps the backflow from coming back in the tank once it is pumped out. He described the "mercury switches" inside the tank that turn the pump on and off. Wright explained that the pump is connected to a discharge, but the line from the customer's house is not attached to the pump.

Although they did not own the home at the time, the system at the Selfs' address was updated on March 27, 1995 with a new panel box, control panel, all new discharge, and a new coupler. The evidence does not show what material the new coupler was made of but Ciardo testified that, in 1995, the District was using couplers made of a PVC composite material. On April 8, 2015, the District sent a technician to the Selfs' home because "the house unit was not working and backing up." At that time, they replaced the start capacitor, which is an electrical component in the control panel, and the pump. The coupler was not replaced at that time because it was working. Another repair was done at the Selfs' house on September 7, 2016 because the house unit was backing up. On that date, the coupler was replaced with a brass coupler, and the check valve was changed out. Ciardo "was told that the coupler had come apart that hooks the pump to the discharge." Wright explained that "[t]he plastic connector had

malfunctioned and caused the connector to blow apart." This was the event that precipitated Self's lawsuit.

Ciardo explained the function of the coupler, which connects the pump to the discharge line. It gives District employees "the ability to remove the pump without cutting pipes for either replacement, repair, service, whatever we need to do." The coupler has two "ears" which, when pulled to close them, lock the coupler down. There is no motor in the coupler. It merely assists in disconnecting the pump if it needs to be worked on. Wright also explained that the only function of a coupler is to provide a way to "get it apart" and get the pump out to repair it or replace it. The District uses couplers made of different materials, such as black iron, aluminum, a composite material, and brass. Couplers are also referred to as a quick connect or a disconnect.

The District has been using brass quick connects to replace broken quick connects for at least seven years. However, Ciardo has never told his employees that they need to replace the plastic couplers if they see them, and never told them they need to be thrown out. The District has not instructed its workers to replace poly connectors with brass connectors unless they are broken.

Ciardo explained:

> If the coupler were to fail, being it's a pressurized system, the sewage would come back off the collection system and just flood the tank. And, I mean, it would just fill the tank up. Because it's a pressurized system, it would just keep flowing and flowing and flowing until the valve in your Exhibit No. 2 – until that valve closed. Once that valve is closed, then the sewage would stop.

The referenced valve, the gate valve, has to be turned off by hand. It has a turn handle on the top of it that raises and lowers the gate inside and shuts off the discharge. Ciardo further explained that if the coupler fails, it would not affect the check valve, which is located on the opposite side of the coupler from the gate valve. If the coupler fails and the tank fills with sewage, gravity would take over. The sewage could flow on top of the ground or back into the customer's house, depending on elevation. If the customer put in cleanouts and backflows, the sewage would come out there.

Wright further explained that "anywhere the line may separate for whatever reason, inside or outside the can, it's going to backflow gravity. Gravity is going to make it backflow." If the coupler failed, anything coming from anyone else's house or the main line that is at a

higher elevation than this tank, can flow backwards through the discharge line and can be dumped into the tank.

The testimony also addressed the significance of whether the pump was operating at the time the coupler failed. Ciardo did not know if the power was on at that time. If the coupler breaks, the discharge dumps sewage back into the tank, and the discharge floods the tank. If the power is still on, as the tank filled up, the floats would kick the pump on. As Ciardo explained, "[i]f the pump was tripped out, it wouldn't be running. It would just be sitting there. If the pump was running, it would be doing nothing but just running in a circle. It couldn't do anything. It's not pumping anywhere." Because the pump is not connected to anything, it does not pressurize the tank. The pump does not create any more fluids. Wright explained that if the coupler failed and the power was on, the pump would try to pump. But it would not be moving anything out. Instead, the sewage would be circulating in the tank. If the pump is working properly, it would be circulating what is in the tank, but it would not be adding to what is in the tank. The sewage would go out to the ground or through the line connected to the tank and back into the customer's house.

Ciardo also testified regarding the effect of a malfunctioning check valve, whose purpose is to prevent sewage from backing up through the pump. To his knowledge the check valve was operating properly. However, because the check valve was replaced in September, he suspected it was bad.

Assuming the coupler is functioning properly, but the check valve is bad, if it is closed, sewage will not back up anywhere. If the check valve is bad, and it is open, sewage will back up in the tank. If the tank has power, as levels of sewage rise, the pump will come on, and try to eject the sewage back out. The pump creates force to get the water out of the tank. The pump can put out about 60 PSI leaving the system, so pressure lines can have a lot of pressure on them. There is high pressure coming in because of the back-up and high pressure going out yet, Ciardo testified, it is not possible that the plastic coupler blew out from those two pressures meeting because it is the same pressure. He further testified that the pressure does not exceed the limit of the coupler. The coupler was made of schedule 80 PVC.

Wright stated that he had no idea what blew the coupler. When asked if it was possible that the main line sewage backflowed up to the check valve, kicking on the pump, and causing the coupler to blow, Wright said the coupler is supposed to hold it, it is not supposed to blow

9

apart. He then stated that he did not think pressure can blow the coupler. Wright also testified that it is not possible for the pressure of the pump and the back pressure to blow the coupler. He stated that there is not a motor inside the coupler.

Further, Wright did not see how the pump could add pressure after the coupler is broken because the wastewater is just slurrying in the tank. He explained that the pump adds pressure to the line if it is connected, but when the coupler is broken, the line is not connected, and the pump is not creating pressure. The pump is just recirculating. When the coupler broke, "the path of least resistance was from the discharge in the can, not from the pump out." Wright testified that the pump did not pump wastewater out of the tank, therefore the pump did not contribute to the flooding.

Self presented a plumber, Dale Calloway, as his expert witness. Calloway said the type of pump used can produce quite a lot of pressure. He stated that, if the discharge line is stopped up and the pump keeps pumping, it is possible for the pump to make enough pressure to blow the coupler. If the coupler is blown, the slurry will be dumped into the tank. The pump will continue to run and eject fluids that it is pumping back into the tank, which assists in pressurizing the tank. Calloway testified that the slurry will

> take the path of least resistance. So when the pump kicks on and this line is broken and it's dumping from your main discharge back into his tank and then the pump is pumping a line up and it's broke . . . . just whatever is coming through them is going right into the tank. And then when it comes up and it gets filled up and it's got nowhere to go, it's going to follow the path of least resistance, which is the house.

He agreed with Self's counsel that the pump contributed to the flooding because it was on and pumping, it built up pressure, it caused the flooding of the home, and the pump could actually be the culprit that blew the coupler in the first place.

On cross examination, Calloway admitted that he did not know what caused the coupler to blow. He could only speculate.

Calloway explained that, "if it's all stopped up," the pump causes sewage to go back in the house or to wherever it was going. So if you stop the pump, the sewage "quits going back in the house." However, if the coupler is broken, and the pump is off, sewage would continue to come in and fill the tank because other pumps are pumping down the road. When asked if sewage would enter the customer's house if the pump is off, Calloway said:

> [w]ater from the house is going to start coming back because it's gravity flow. This right here, you don't know because you don't know if there's five pumps on down the line that are on pushing it this way or if they've all turned off and nothing is going to push it. So it could and it couldn't. . . . When this discharge line breaks, everything – every pump down there and everything is going to pump back this way because it doesn't have nowhere else to go.

He further stated that because the coupler is gone, if the pump is off, sewage would come through the discharge pipe and fill up the tank, but it probably would not go back in the house. But if sewage continues to flow into the tank and the level continues to rise, it could push the sewage back up in the house. Calloway also explained:

> I'm making the assumption that the system is working right and that it had an accident. The coupler blew. So that changes everything. This is going to come this way. When it gets so full, it's going to take the path – say the tank was only at the top of the ground, the lid was. Well – and those tanks, they got seals around them and bowls. Usually unless that seal is – it won't come out the top of the tank. It will go into this line or that line, whichever one is on there.

In his petition, Self repeatedly referenced "the motor-driven sewage vault system." His specific complaint is that the District employees who repaired his "motor-driven vault system" in April 2016 did not replace the plastic coupler at that time. He simultaneously alleged that his damages "were due to the ordinary operation and use of the motor-driven vault system" and "[b]ut for the negligent repair and maintenance of the vault system, the Plaintiff would not have suffered damage." He did not, in his petition, allege that the use of the pump caused his damages. He alleged that the "[f]ailure of the vault system . . . led to back up of raw sewage into the Plaintiff's home." Specifically, he asserted that use of an inferior part, a plastic coupler, constitutes an overt act and intent to damage his property because flooding from sewage was foreseeably certain to occur. In his brief, Self explained his position that, while pumping as it normally operates, the pump discharged sewage through the blown out coupler and back into the sewage vault. He further argues that operation of the "pump with known defective parts was negligent."

Witnesses described the residential vault system which collects sewage from individual homes before sewage is funneled through the District's distribution system, into different stations, and then to the District's wastewater treatment facility. Even if we accept as true Self's

argument that the vault system is made up of components that together, form a system, it does not follow that the coupler is a part of the pump. The evidence shows that the pump is the only motorized component of the residential collection system. The only component of the system that failed was the coupler.

To avoid a determination that the District retains immunity, Self was tasked with raising a fact issue regarding whether his damages arose from the operation or use of motor driven equipment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A). It is undisputed that the plastic coupler failed and that the coupler is not motorized. The coupler connects two sections of the discharge line and its sole purpose is to provide easy access to the pump when the pump needs to be replaced or repaired. There is no evidence that the coupler assists in sewage collection other than to the extent it helps maintain the connection between the pump and the discharge line going out of the residential vault.

If the coupler is broken and the pump is working, District witnesses claim it would merely circulate the sewage in the tank. In this situation, the pump neither adds to the amount of sewage nor forces it in any particular direction. Calloway also testified that if the pump is on and the coupler is broken, sewage would be dumped into the tank from the main discharge line and when the tank is full, sewage will follow the path of least resistance and go into the house. This part of his testimony is entirely consistent with the District's evidence. Calloway also said if the coupler is broken and the pump is on, the pump will assist in pressurizing the tank. There is no explanation as to how it pressurizes the tank or why the result of a pressurized tank is the same as the result in the District's scenario where the tank is not pressurized since the coupler is broken. *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003) ("Expert opinions must be supported by facts in evidence, not conjecture."). Calloway's statement that the pump, assuming it is on, assists in pressurizing the tank when the coupler is broken is so weak as to provide no more than a scintilla, and in legal effect, is no evidence. *See Suarez*, 465 S.W.3d at 634. Other than that statement, there is no evidence that the pump contributed to the flow of sewage into Self's home.

Even Calloway agreed that, if a coupler fails, and the pump is off, sewage cannot leave the tank via the discharge line, and it will fill up the tank. District witnesses explained that where the sewage traveled once the tank is full depends on the elevation of the vault and the

12

practical effects of gravity. Calloway acknowledged that sewage could go in the house if sewage continues to flow into the tank, even if the pump is off.

The evidence shows that, if the coupler breaks, whether the pump is on or not, the sewage in the tank would flow out to the ground or through the line in the tank and back into the house, due to the force of gravity, not the operation or use of motorized equipment. Mere involvement of equipment is not enough. *See Whitley*, 104 S.W.3d at 543. Under the facts of this case, the flooding of Self's home with sewage would not have occurred but for the broken coupler. *See Ryder Integrated Logistics, Inc.*, 453 S.W.3d at 929. The flooding by sewage would have occurred regardless of use of the pump. Self has not shown that but for the use of the pump, he would not have suffered damages. At best, to the extent the pump contributed to the amount of sewage traveling through the coupler, combined with normal deterioration from two decades of use, it may be said that the pump furnished the condition that made the injury possible. This is insufficient to satisfy the TTCA standard. *See Bossley*, 968 S.W.2d at 343.

Self's allegation that operation of the "pump with known defective parts was negligent" insinuates that the coupler is a pump part. This bare allegation will not survive a plea to the jurisdiction challenging the existence of jurisdictional facts. *See Univ. of Tex. Health Sci. Ctr. at Tyler v. Nawab*, 528 S.W.3d 631, 643 (Tex. App.—Texarkana 2017, pet. denied). We do not agree with Self's assertion that the coupler is "part and parcel" of the motor driven pump. The broken plastic coupler caused the back up of sewage into Self's home, not the motor-driven pump. This is insufficient to establish a waiver under the TTCP. *See Galveston Racquet Club, Inc. v. City of Galveston*, 178 S.W.3d 167, 170-71 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

In the alternative, Self argues that the pump was the actual cause of the coupler failure because the pump produced pressure on the discharge line inside the vault. He contends that if the discharge line is stopped up and the pump keeps pumping, the pressure produced by the pump could "blow the coupler," pressurize the sewage vault, and force sewage back into the house.

Ciardo testified that the pressure created by the pump does not exceed the limit of the coupler. He explained that there is pressure coming into the vault and pressure going out. However, he said it is not possible that the coupler blew from the two pressures meeting because

it is the same pressure. Wright also said it is not possible for the pressure of the pump and back pressure to blow the coupler.

Calloway testified that, if the discharge line is stopped up, and the pump keeps pumping, it is possible for the pressure to blow the coupler. This is pure conjecture on Calloway's part. There is no evidence that the line was stopped up. Further, when in response to a series of leading questions, Calloway agreed with counsel that the pump contributed to the flooding because it was on and pumping, it built up pressure, it caused the flooding, and could be the culprit that blew the coupler in the first place, he provided conclusory testimony based on surmise. There is no evidence that the pump was on when the coupler broke or when the sewage back up occurred. Therefore, Calloway's testimony is no more than a scintilla of evidence and, in legal effect, no evidence. *See **Suarez***, 465 S.W.3d at 634. We conclude that Self did not meet his burden to establish a fact issue as to whether the flooding of his home with sewage "arose from" the use of motor-driven equipment. *See **Ryder Integrated Logistics, Inc.***, 453 S.W.3d at 929. We overrule Self's first issue.

## Premises Defect

In his third issue, regarding his premises liability claim, Self contends that he alleged that he is an invitee because he pays the District for use of the sewage vault. Additionally, Self asserts that the only disputed elements of the premises defect claim are whether the District (1) knew the plastic coupler could blow apart and cause flooding, and (2) took action to mitigate that harm to others through warning or corrective action. He argues that, at a minimum, a fact issue exists with regard to whether the District knew of the "substandard" coupler. He asserts that the District knew the ramifications of a blown coupler, but did not replace it in 2015, or warn Self of the potential danger.

Under the TTCA, sovereign immunity is waived for personal injury and death caused by a condition or use of tangible personal property or real property if the governmental unit would be liable to the claimant according to Texas law if it were a private person. TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2). A premise-defect claim is a common instance of a claim for "injury and death caused by a condition of . . . real property." ***Tarrant Reg'l Water Dist. v. Johnson***, 572 S.W.3d 658, 664 (Tex. 2019).

In a premises defect suit against a governmental unit under Section 101.021, liability is not based on the actions of the governmental unit's employees. ***Tex. Dep't of Transp. v. Able***,

35 S.W.3d 608, 612 (Sup. 2000). With premises defects, liability is predicated by reference to the duty of care owed by the governmental unit to the claimant for premise and special defects as specified in Section 101.022. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022; *Able*, 35 S.W.3d at 612. Ordinarily, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property. TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a). However, if the claimant pays for the use of the governmental unit's premises, the governmental entity owes the claimant the duty owed to an invitee. *See id*; *City of Fort Worth v. Posey*, 593 S.W.3d 924, 927 (Tex. App.—Fort Worth 2020, no pet.).

An invitee must prove that a condition of the premises created an unreasonable risk of harm to the invitee, and the owner failed to exercise ordinary care to protect the invitee from danger. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992) (op. on reh'g). The duty to an invitee requires an owner to "make safe or warn against any concealed, unreasonably dangerous conditions of which the [owner] is, or reasonably should be, aware but the invitee is not." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015). A licensee must prove that the premises owner actually knew of the dangerous condition, whereas an invitee need only prove that the owner knew or reasonably should have known of a dangerous condition. *Id*.; *Payne*, 838 S.W.2d at 237. Constructive knowledge is a substitute in the law for actual knowledge. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 102 (Tex. 2000). In premises cases, constructive knowledge can be established by showing that the condition existed long enough for the owner to have discovered it upon reasonable inspection. *Id*. at 102-03. Finally, both an invitee and a licensee must prove that the owner's failure to use the requisite care proximately caused his injury. *Payne*, 838 S.W.2d at 235.

In his petition, Self alleged a cause of action he entitled "injury by premises defect and injury after payment for use of premises." He alleged that the District controlled the defective premises, that is, the motor-driven vault system, which contained a defective valve which posed an unreasonable risk of harm; the District had actual knowledge of the premises defect; Self did not have actual knowledge of the defect; the District "breached its duty of ordinary care by installing a defective valve and not warning Plaintiff of the defect;" the District's breach proximately caused personal injuries to Self, who was a paying customer for the use of the premises; and the "negligent repair and maintenance of the motor-driven vault system does not fall into the realm of a discretionary-activity exception."

15

Although the petition asserts that the District knew of the condition of the premises that created an unreasonable risk of harm, without also alleging the District should have known, it does allege that Self paid for the use of the sewage vault which is controlled by the District, and the District breached its duty of care. Construing the pleading liberally in favor of Self, we conclude that Self is asserting invitee status. *See Heckman*, 369 S.W.3d at 150. We next consider whether Self raised a fact issue on the question of whether the District knew or should have known of a dangerous condition that created an unreasonable risk of harm to an invitee.

Based on the evidence, apparently the coupler that broke had been in place since 1995. District employees worked on Self's system in April 2015. Ciardo testified that the coupler was not replaced then because it was working at that time. The District has been using brass couplers to replace broken couplers for at least seven years. However, Ciardo testified that he never told his employees to replace plastic couplers or that they need to be "thrown out" unless they are broken. Wright testified that brass couplers also break.

In his testimony, Self explained that District employees came to his house in response to his call about the sewage back up in September 2016. In an effort to avoid hearsay, Self stated that, based on what those employees said, his impression was that the plastic coupler was not to be used and that the District employee who worked on his system in April 2015 was in big trouble. He did not specify why that employee was in trouble.

The duty owed by an owner of premises to an invitee is not that of an insurer. *CMH Homes, Inc.*, 15 S.W.3d at 101. A premises owner is not strictly liable for defects on its premises. *Id*. The fact that materials deteriorate over time and may become dangerous does not itself create a dangerous condition, and the actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time. *See City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006) (per curiam). Furthermore, the mere fact that a dangerous condition may tend to develop over time does not support an inference of actual knowledge that the dangerous condition existed at the time of the injury. *See City of Austin v. Leggett*, 257 S.W.3d 456, 476 (Tex. App.—Austin 2008, pet. denied). However, an owner may be liable for injury caused by concealed deterioration of its premises if it knew the premises had become unsafe or a reasonable inspection, if conducted, would have revealed that the deterioration caused an unsafe condition. *CMH Homes, Inc.*, 15 S.W.3d at 101. Nonetheless, evidence that a property owner

knew of a safer, feasible alternative design, without more, is not evidence that the owner knew or should have known that a condition on its premises created an unreasonable risk of harm. *Id*. at 102.

Since Ciardo admitted that plastic couplers broke, we assume the District had actual knowledge that the plastic coupler would present an unreasonable risk of injury by virtue of its use at some point in time. There is no testimony as to the length of time a plastic coupler will ordinarily last before breaking. The coupler in Self's system had been safely used for over twenty years. Therefore, even though the plastic couplers break eventually, there is no evidence that the coupler was a dangerous condition from the inception of its use. *See id.* at 100-01. It was only at some point in time after installation that the coupler could pose an unreasonable risk of harm due to deterioration. *See id*. at 101.

Although the District now replaces broken plastic couplers with brass couplers, this is not evidence that the District knew or should have known that use of a plastic coupler created an unreasonable risk of harm. *Id*. at 102. There is no evidence that the plastic coupler was unreasonably dangerous because it was not impervious to wear and tear. *See id*. at 101-02. Self did not present any evidence that the coupler inherently presented an unreasonable risk of harm because it could break after prolonged use. *See id*. at 102.

Self's testimony is nothing more than an inference that use of the plastic coupler created an unreasonable risk of harm and an inference that the District knew of that risk. *See Marathon Corp.*, 106 S.W.3d at 728 ("[A]n inference stacked only on other inferences is not legally sufficient evidence."). Self's testimony is no more than a scintilla of evidence, and in legal effect, no evidence that the coupler presented an unreasonable risk of harm or that the District knew or should have known of that risk. *See Suarez*, 465 S.W.3d at 634. Thus, there is no evidence that the District knew or should have known that the coupler posed an unreasonable risk of harm. *See CMH Homes, Inc.*, 15 S.W.3d at 103.

Furthermore, there is no evidence the District failed to use reasonable care to determine whether the coupler was about to break or whether it is possible to make such a determination. *See CMH Homes, Inc.*, 15 S.W.3d at 101. Less than a year and a half before the incident at issue, the coupler was working as intended. Ciardo's testimony provides an inference that the coupler was inspected in April 2015. There is no evidence that couplers were ordinarily

17

inspected on a regular basis, and no contention that the District failed to inspect as frequently as it should. *See id.* at 102.

Self has not presented evidence raising a fact question as to whether the District knew or should have known of a dangerous condition of the premises that created an unreasonable risk of harm to Self. *See Austin*, 465 S.W.3d at 203. Therefore, the District's immunity is not waived for Self's premises liability claim.

## Constitutional Taking

Also in his third issue, Self contends the record indicates that the District had the requisite intent to support his takings claim and that the damage of his property was for public use. Self alleged in his pleading that the District knew that the utilization of an inferior part in the motor-driven pump system causes identifiable harm and that specific property damage was substantially certain to result from the repair, maintenance, and use of the system. As a result, he alleged, his property was taken, damaged, or destroyed for or applied to public use without just compensation in violation of the Texas Constitution's takings clause.

The Texas Constitution provides that no "property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17(a). To establish a claim under this provision, a plaintiff must prove: (1) the government intentionally performed certain acts; (2) that resulted in the plaintiff's property being taken, damaged, or destroyed; (3) for public use. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). If a plaintiff cannot establish a viable inverse condemnation claim, the government retains immunity, and the court lacks jurisdiction over the dispute. *Tex. Dep't of Trans. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013).

In the context of an inverse condemnation claim, "the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004). A governmental entity is substantially certain that its actions will damage property when the damage is necessarily an incident to or necessarily a consequential result of the governmental entity's action. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009). A taking cannot be established by proof of mere negligent conduct by the government. *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016). Awareness of the mere possibility of damage is no evidence of intent. *Pollock*, 284 S.W.3d at 821. When damage is

merely the accidental result of the government's act, there is no public benefit and the property cannot be said to be taken or damaged for public use. *Tex. Highway Dep't v. Weber*, 219 S.W.2d 70, 71 (Tex. 1949).

The factual basis for Self's claims focuses on the District's installation of a plastic valve twenty years before he suffered damages and the District's negligent repair and maintenance of the vault system in the years that followed. To the extent his takings claim asserts negligence, it is not a viable inverse condemnation claim. *See Kerr*, 499 S.W.3d at 799.

Furthermore, as explained above, there is no evidence that the District knew that its use of a plastic coupler created an unreasonable risk of harm to Self. It follows that there is no evidence that the District knew that harm was substantially certain to result from its use of a plastic coupler. *See Gragg*, 151 S.W.3d at 555. Because Self cannot establish a viable takings claim, the District retains immunity from this claim. *See Tex. Dep't of Transp.*, 397 S.W.3d at 166.

## Non-negligent Nuisance

Self alleged a claim for non-negligent nuisance, asserting that the District caused an invasion of his interest in the private use and enjoyment of his property by flooding his home with sewage, thereby creating a nuisance which is the proximate cause of his damages. He asserts that the decision to not replace the plastic coupler in April 2015 constitutes more than just mere negligence, it rises to the level of non-negligent nuisance.

There is no separate waiver of governmental immunity for nuisance claims. *See City of Dallas v. Jennings*, 142 S.W.3d 310, 316 (Tex. 2004). Here, because the District has not waived immunity under either the TTCA or the takings clause of the Texas Constitution, the District is also immune from Self's nuisance claim. *See id*.

## Breach of Contract

Self alleged that he and the District entered into a contract by which the District provided goods and services to Self, and the District breached that contract by failing to properly maintain and operate the sanitary sewer and water system. Local Government Code Section 271.152 provides for a limited waiver of immunity to suit for the purpose of adjudicating a claim for breach of a "contract subject to this subchapter." TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2016). "Contract subject to this subchapter" means, in part, a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity

that is properly executed on behalf of the local governmental entity. *Id.* § 271.151(2)(A). Self argues that the contract requires him to provide a service cleanout, a backflow prevention device, a vacuum breaker, and a cutoff valve, thus satisfying the statute's requirement that the plaintiff provide goods to the local governmental entity.

Ciardo testified that customers are required to provide those devices before the District will install a meter or a tank. The term "goods and services" includes generally any act performed for the benefit of another under some agreement. *See JNC Land Co. v. City of El Paso*, 479 S.W.3d 903, 910 (Tex. App.—El Paso 2015, pet. denied). Here, the provision of those devices was for Self's benefit, required before he could obtain sewage services. Any benefit the District received was indirect which is insufficient to satisfy the statute. *Id.* Accordingly, the District has not waived its immunity to Self's breach of contract claim.

## Conclusion

There is no evidence the District knew or should have known of a dangerous condition of the premises that created an unreasonable risk of harm to Self, no evidence the District knew its actions would damage Self's property, and no evidence of the applicability of Local Government Code Section 271.152. Self has not established viable premises liability, takings, non-negligent nuisance, or breach of contract claims, or raised fact questions regarding any jurisdictional issue. Therefore, the District retains immunity from these claims. We overrule Self's third issue.

### DISPOSITION

Having overruled Self's three issues, we *affirm* the trial court's final judgment, based on its order granting the District's plea to the jurisdiction, ordering that Self take nothing.

GREG NEELEY
Justice

Opinion delivered January 6, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

20



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 6, 2021**

**NO. 12-20-00082-CV**

**SEAN SELF,**
Appellant
V.
**WEST CEDAR CREEK MUNICIPAL UTILITY DISTRICT,**
Appellee

Appeal from the 392nd District Court

of Henderson County, Texas (Tr.Ct.No. CV17-0355-392)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **SEAN SELF**, for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*